IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ISR GROUP, INCORPORATED, | § | Case No. 14-11077-JLC |
| | § | Chapter 11 |
| DEBTOR. | § | |

DECLARATION OF JOHN STUECHELI
IN SUPPORT OF CERTAIN FIRST DAY PLEADINGS

1. My name is John Stuecheli. I am the sole director, President, and Chief Restructuring Officer of ISR Group, Inc. (the "Debtor"), the debtor-in-possession in the above-captioned bankruptcy case (the "Bankruptcy Case"). In this capacity, I am generally familiar with the Debtor's day-to-day operations, business and financial affairs, books and records.

2. On the date hereof (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code").[1] The Debtor is operating its business and managing its properties as a debtor in possession under Section 1107 and 1108.

3. To enable the Debtor to minimize the adverse effects of the commencement of the Bankruptcy Case on its business, the Debtor has requested various types of relief in its "first day" motions and applications (each, a "First Day Motion" or "Motion"). The First Day Motions seek relief intended to allow the Debtor to: (a) retain the professionals needed to guide it through its chapter 11 Bankruptcy Case and (b) perform and meet those obligations necessary to fulfill its duties as a debtor-in-possession in the chapter 11 Bankruptcy Case. I am familiar with the contents of each of the First Day Motions (including the exhibits thereto), and I believe that

---

[1] All of the statutory references contained in this Declaration will be to the Bankruptcy Code, unless otherwise indicated.

_____
**Declaration of John Stuecheli in Support of Certain First Day Pleadings**                                    **Page 1**

the relief sought in each of the First Day Motions: (a) is necessary to enable the Debtor to operate in Chapter 11 with minimal disruption or loss of productivity or value; (b) constitutes a critical element to achieving a successful reorganization of the Debtor; and (c) best serves the Debtor's estate and creditors' interests.

4. I submit this Declaration in support of the First Day Motions. Except as otherwise indicated, all of the facts set forth herein are based upon my personal knowledge of the Debtor's operations and finances, information learned from my review of relevant documents, or information supplied to me by other members of the Debtor's management and the Debtor's professionals. I am authorized to submit this Declaration on behalf of the Debtor, and if called on to testify, I could and would testify competently to the facts set forth herein.

## I. THE DEBTOR'S BUSINESS AND OPERATIONS

### A.    Overview of the Debtor's Business

5. Prior to the Petition Date, the Debtor was a veteran-owned business based in Savannah, Tennessee that provided a broad range of services in the unmanned vehicle systems industry. Unmanned vehicles, sometimes referred to as "drones," are used for many different purposes, including security and surveillance, military and national defense operations, law enforcement and border patrol operations, maritime operations, and disaster relief operations.[2] Pre-petition, the Debtor generally provided technical support, training, logistics and repair services for unmanned aircraft, marine vessels, and ground vehicles used in these and other industries.

6. Historically, the Debtor operated through four business divisions. ISR Technical Services deployed highly-skilled professionals to support research & development, production,

---

[2] For example, authorities have utilized unmanned vehicles in the search for missing Malaysia Airlines flight 370. One of ISR's drones was also featured in the film "Captain Phillips."

---

**Declaration of John Stuecheli in Support of Certain First Day Pleadings**                                      **Page 2**

operations, maintenance, and logistical activities of unmanned vehicle systems throughout the world. ISR Training provided tailored training programs at the Debtor's Savannah headquarters to support ground, air, and maritime unmanned vehicle systems. ISR Logistics and Depot operated a dedicated depot complex at the Debtor's headquarters that provided a cost effective logistical operations and maintenance center for unmanned vehicle programs. ISR Range Services provided customers a 10 square mile practice and training range located in Hardin County, Tennessee for training, testing, and developing various unmanned vehicle systems.

7. Pre-petition, the Debtor's operations were authorized by the Federal Aviation Administration (the "FAA") and the Debtor was registered with the United States Department of State's Office of Defense Trades Controls Compliance as a Manufacturer and Exporter of defense articles and services.[3]

B. **Ownership and Capital Structure**

8. As of the Petition Date, 100% of the equity in the Debtor is owned by ISR Group Holdings, Inc. ("ISR Holdings"). ISR Holdings is principally owned by Alfred Lumpkin who, prior to the Petition Date, also served as the Debtor's sole director, President, and Chief Executive Officer.[4] As discussed more fully below, Mr. Lumpkin resigned his positions with the Debtor as of April 23, 2014 and appointed me to my current role as the Debtor's sole director, President, and Chief Restructuring Officer.

C. **Prepetition Debt Structure**

9. Prior to the Petition Date, the Debtor and ISR Holdings entered into that certain Loan Agreement dated March 28, 2012, with PNC Bank, National Association ("PNC") (as

---

[3] Upon information and belief, some of the Debtor's government licenses or authorizations may have lapsed as a result of the cessation of the Debtor's operations discussed below. The Debtor intends seek reinstatement of any such licenses and authorizations necessary to its operations post-petition.
[4] Mr. Lumpkin owns 73% of the stock in ISR Holdings.

---

amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, the "Existing Credit Agreement"). The Existing Credit Agreement provided for a $22.5 million term loan and $5 million line of credit. The obligations of the Debtor and ISR Holdings under the Existing Credit Agreement: (i) are secured by substantially all of their assets (the "Prepetition Collateral"); (ii) are evidenced by an Amended and Restated Term Note in the amount of the aggregate outstanding principal amount of each advance, together with accrued but unpaid interest on the principal amount of each such advance (the line of credit having been previously terminated by PNC); and (iii) mature on March 31, 2017 (the "Maturity Date").

10. Prior to the Petition Date, PNC made loans, advances and provided other financial accommodations to the Debtor and ISR Holdings pursuant to the terms and conditions set forth in the Existing Credit Agreement and all other agreements, documents and instruments executed and/or delivered with, to, or in favor of PNC, including, without limitation, ISDA Master Agreement (with associated schedule and confirmation), all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments executed and/or delivered in connection therewith or related thereto (all of the foregoing, together with the Existing Credit Agreement, as all of the same have heretofore been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, collectively, the "Existing Credit Documents").

11. As of the Petition Date, the aggregate amount of all obligations owing by the Debtor and ISR Holdings to Lender under and in connection with the Existing Credit Documents was not less than $17,444,444.04, plus interest accrued and accruing thereon, together with all

costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto (collectively, and as such term is more fully defined in the Amendment, the "Pre-Petition Obligations").

12. Prior to the Petition Date, certain Events of Default (as defined in the Existing Credit Documents) occurred, and PNC accelerated the Prepetition Obligations of the Debtor and ISR Holdings as a result. By virtue of the issuance of the establishment of the Existing Credit Agreement, each of ISR Holdings and the Debtor is primarily or secondarily liable and obligated for the repayment of all obligations under the Existing Credit Agreement and substantially all of their respective assets constitute collateral therefor.

13. As discussed below, PNC assigned, sold and delegated all of its rights and obligations under the Existing Credit Documents to TCFI IG LLC, an affiliate of Trive Capital, pursuant to the Loan Sale Agreement (the "Assignment") dated as of April 22, 2014, by and among PNC and TCFI IG LLC.

## II. EVENTS LEADING TO THE DEBTOR'S BANKRUPTCY

A. **Decrease In Revenue Leads To Liquidity Crisis**

14. Historically, the Debtor's primarily derived its revenue from providing support services, including development, training, and logistical services in connection with unmanned vehicle systems utilized by the United States military. For example, the Debtor provided training to the United States Armed Forces in connection with the use of unmanned aerial vehicles (drones) in Iraq and Afghanistan. A significant portion of the Debtor's pre-petition revenue was derived from these and other support services related to the Boeing Insitu "ScanEagle" unmanned aerial vehicle.

15. The Debtor began to see a decline in its revenue as the United States reduced its military activities in the middle east. I am informed and believe that, during approximately the

---
**Declaration of John Stuecheli in Support of Certain First Day Pleadings**                                      **Page 5**

same time, the Debtor lost certain key employees and was underbid by competitors on several lucrative contracts. The reduction in revenue on existing business coupled with the failure to secure these new contracts had a significant negative effect on the Debtor's revenue.

16. The decrease in revenue caused the Debtor to fall out of compliance with the covenants in the Existing Loan Documents. In late 2012, the Debtor fell below the total leverage ratio and the fixed charge ratio required by the Existing Loan Documents. On July 31, 2013, PNC notified the Debtor of the occurrence of an event of default under the Existing Credit Documents. By letter dated August 16, 2013, PNC informed the Debtor that, as a result of the events of default, PNC would no longer make any advances or provide any additional funds under the Existing Credit Documents.

17. After receiving notice of default from PNC, the Debtor began exploring options to secure additional financing. However, given its operational issues the Debtor was unable to secure traditional bank financing and therefore began exploring alternative financing arrangements such as a capital infusion or sale of some or all of the Debtor's assets. The Debtor met with various potential sources of funding during the second half of 2013 but was ultimately unable to reach an agreement to secure the additional financing necessary to continue operating.

**B.   Cessation Of Operations**

18. On or about October 2, 2013, PNC accelerated the amounts due under the Existing Credit Documents and exercised its rights to sweep the Debtor's bank accounts and seize control of the Debtor's accounts receivable. PNC subsequently directed all of the Debtor's customers to make payments directly to PNC. Without its cash and incoming revenue, the Debtor was unable to meet its operating expenses, including payroll, as those came due. As a result, the Debtor effectively ceased operations and shut down in early 2014.

___

**C.     Trive Purchases The PNC Indebtedness**

19.     In late 2013 or early 2014, Trive Capital ("Trive") became interested in acquiring some or all of the Debtor's assets.  Trive negotiated extensively with the Debtor and its principal, Alfred Lumpkin, regarding various means through which Trive could acquire the Debtor and its assets.  Trive proposed several alternatives that would have allowed the Debtor to resume operations, rehire its employees, and pay creditors in full.  Ultimately, however, the Debtor declined Trive's offers.

20.     Recognizing significant value in the Debtor's dormant business, Trive proceeded with its efforts to acquire the Debtor.  On or about April 22, 2014, Trive reached an agreement to acquire the PNC indebtedness via an assignment of the Existing Loan Documents from PNC to TCFI IG LLC (the "Lender"), a Trive affiliate.  Upon receiving assignment of the Existing Loan Documents, the Lender notified the Debtor that it had acquired the PNC indebtedness and that it was instituting a proceeding to foreclose on the stock in the Debtor (the Lender's collateral under the Existing Loan Documents) via a public sale.

21.     Upon acquiring the PNC indebtedness, the Lender reached an agreement with the Debtor and Alfred Lumpkin that will allow the Debtor to avoid liquidation, institute a new business plan, and continue operating into and out of bankruptcy.  Under the agreement and with approval of the Bankruptcy Court, the Lender will lend sufficient new capital to enable the Debtor to resume operations and fund a bankruptcy sale process.  As discussed more fully below, the Lender agreed to provide a $1-2 million DIP loan to facilitate the bankruptcy and sale of the Debtor and to provide additional funds to pay employees' claims for unpaid wages.  The Lender has also agreed to pay unsecured creditors provided that the Debtor meets certain operating incentives.  In exchange, Lumpkin agreed to resign all positions with the Debtor and to cede control of the Debtor's operations to me as President and Chief Restructuring Officer.

---

**D.     The Bankruptcy And Sale**

22.     The Lender has agreed to fund this Chapter 11 bankruptcy proceeding in order to facilitate the marketing and sale of the Debtor's assets.  I have been retained by the Debtor to resume the Debtor's operations, to serve as Chief Restructuring Officer during the pendency of this bankruptcy proceeding, and to assist in the marketing and sale of the Debtor's business.  As discussed above, the Lender has committed a significant amount of capital resources in order to restore and preserve the value of the Debtor's business as a going concern.  The Lender's capital infusion will enable the Debtor to resume its operations, rehire certain former employees, and resurrect several valuable business contracts while contemporaneously marketing the Debtor's business for sale.

23.     At its peak, the Debtor had more than 250 employees and independent contractors.  The revival and rehabilitation of the Debtor's business will benefit both the Debtor's creditors and the local community by restoring or creating additional employment opportunities, generating additional tax revenue, and providing the additional economic benefits associated with an ongoing growing business.

24.     Under the circumstances, I believe the resumption of the Debtor's dormant business and the restoration of the Debtor's valuable contracts is necessary in order to realize the full value of the Debtor's estate and provide a return to the Debtor's creditors.  In addition, resuming operations will provide a valuable opportunity for ongoing employment to the Debtor's former employees and generate revenue for the Debtor's customers and vendors.  Accordingly, I believe resuming the Debtor's operations while concurrently marketing the Debtor's business for sale to the highest bidder is the best way to maximize the value of the Debtor's business and provide the highest possible return to creditors.

## III. THE DEBTOR'S FIRST DAY MOTIONS

A.     Introduction

25.    In order to facilitate the transition into bankruptcy and minimize the adverse effects of the commencement of the Bankruptcy Case on its business, the Debtor has requested various types of relief in the First Day Motions, all of which are being filed concurrently with this Declaration. I submit this Declaration in support of the following First Day Motions:

   a.   Expedited Motion for Authority to Establish New Debtor-In-Possession Bank Account (the "Bank Account Motion");

   b.   Expedited Motion for Interim and Final Orders (i) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services on Account of Prepetition Invoices, (ii) Approving Procedures for Providing Adequate Assurance of Post-petition Payments, and (iii) Approving Debtor's Proposed Form of Adequate Assurance (the "Utility Motion");

   c.   Expedited Motion for Authority to Pay Pre-Petition Employee Wages and Compensation (the "Wage Motion");

   d.   Motion for Interim and Final Orders Pursuant to Sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code (1) Approving Post-Petition Financing, (2) Authorizing Use of Cash Collateral, (3) Granting Liens and Providing Superpriority Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, and (6) Scheduling a Final Hearing (the "DIP Motion");

26.    I have reviewed each of the First Day Motions (including the exhibits and schedules thereto). The facts stated therein are true and correct to the best of my knowledge, information and belief, and I believe that the relief sought in each of the First Day Motions: (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption to the business operations; and (b) constitutes a critical element in achieving a successful reorganization of the Debtor.

Document    Page 10 of 16

**B.    The Bank Account Motion**

27.    Prior to the Petition Date, the Debtor maintained three bank accounts at PNC Bank, National Association ("PNC").  However, PNC is not designated as an approved depository by the United States Trustee in this region.  As a result, in anticipation of this bankruptcy case the Debtor closed those accounts and established a new debtor-in-possession account at Regions Bank in Memphis, Tennessee.  These actions were intended to bring the Debtor into compliance with the US Trustee's guidelines for Chapter 11 debtors.  Post-petition, except as set forth in the Bank Account Motion the Debtor will comply with all of the US Trustee's guidelines.

**C.    The Utility Motion**

28.    In the ordinary course of business, the Debtor uses gas, water, electric, telephone, and other utility services provided by various utility providers (collectively the "Utilities").  A list identifying each Utility currently providing service to the Debtor is attached to the Utility Motion as **Exhibit A**.  As with most businesses, uninterrupted utility services is critical to the Debtor's ability to maintain its ongoing operations.  Termination of services by the Utilities would effectively preclude the Debtor from operating, resulting in lost revenue and significant harm the Debtor's estate.  As adequate assurance of payment under Section 366(b), the Debtor proposes to place a deposit with each Utility equal to thirty days' average billing based on the average monthly billing over the previous 12 months.   The amount of the proposed deposit for each Utility is set forth on **Exhibit A** to the Utility Motion.  The Debtor will remain current on billing for all post-petition services provided by the Utilities.  I believe that the proposed deposit will adequately assure the Utilities of payment for post-petition utility service.

**Declaration of John Stuecheli in Support of Certain First Day Pleadings    Page 10**

**D.    The Wage Motion**

29.    As set forth above, the Debtor ceased operations in late 2013.  Shortly prior to the Petition Date, the Debtor appointed me as President and Chief Restructuring Officer and partially resumed operations.  In connection with the resumption of operations, the Debtor retained 11 former employees and independent contractors to begin work on shortly prior to the Petition Date.  Collectively, these 11 employees are owed a total of $10,724.35 for work performed on or before April 28, 2014.  In addition, the Debtor's employees may be owed wages for work performed on April 29, 2014 (the Petition Date) but prior to the time the Debtor actually filed its petition for relief (collectively the "Prepetition Wages").

30.    To maintain the continuity of the Debtor's business operations and to preserve the morale of its employees, it is important that the Debtor be permitted to pay the Prepetition Wages at its discretion in the ordinary course of business.  The continued loyalty of a debtor's employees is a necessary component to any successful Chapter 11 case.  The filing of a Chapter 11 petition is a stressful and uncertain time for a debtor's employees and such stress and uncertainty often cause poor employee morale at a time when a debtor needs its employees to be most loyal.  If employees do not receive payment for work performed pre-petition, it is likely that the Debtor will lose employees with little or no notice.  Moreover, many of the Debtor's employees live paycheck to paycheck and would suffer severe adverse consequences if they failed to receive their full compensation.  Likewise, the Debtor would suffer immediate and irreparable harm as a result of any resulting loss of morale, exodus of employees, and disruption to its operations.  Paying the Prepetition Wages will minimize the hardship that employees will certainly endure if payroll is interrupted and will prevent the wholesale loss of employees that would ensue if the employees lost the reasonable expectation that they will be paid for their work.

31. As a result, payment of the Prepetition Wages is necessary to prevent the risk of damage to the Debtor's estate, which would adversely affect all parties in interest. In this case, the continued services and cooperation of the Debtor's employees is integral and necessary to successfully resuming the Debtor's dormant operations and restoring the value of the Debtor's business as a going concern. If the Debtor is unable to assure its employees that they will be paid timely, or if employees are not assured of uninterrupted, critical payments to which they are entitled, the Debtor's post-petition operations would be seriously jeopardized due to employee resentment, resignations, loss of good will and disruption of employee morale. The Debtor has not identified a practical or legal alternative to payment of the Prepetition Wages that would not result in a loss of employees or other disruption of its business. Given the relatively small amounts owed to employees for pre-petition wages, the potential harm and economic disadvantage that would result from the Debtor's failure to pay the Prepetition Wages far outweighs the amount of any pre-petition claim that may be paid.

32. Accordingly, in the exercise of my business judgment I believe that it is in the best interest of its estate to pay the Prepetition Wages as set forth in the Wage Motion in the ordinary course of business.

**E.    The DIP Motion**

33. The Debtor is restarting its business operations and as a result, needs financing to pay its postpetition obligations, including employee wages, property and casualty insurance to protect the Debtor's assets, as well as the administrative expenses of the Debtor's Chapter 11 proceeding, including U.S. Trustee fees and professional fees and expenses, as well as any postpetition taxes or government fees. In addition, the Debtor's prior business operations require on-going compliance with certain Department of Defense regulations which mandate high-level,

___

sophisticated security systems to protect top secret information and technology in the Debtor's as a result of its work for various branches of the armed services.

34.     As set forth above, the Prepetition Obligations are secured by prepetition liens on substantially all of the Debtor's and ISR Holdings' assets and as set forth more fully in the First Day Declaration, absent additional financing the Debtor does not have sufficient liquidity to restart its business operations or comply with applicable government regulations.  In order to preserve and maximize the value of the Debtor's estate, the Debtor needs to take all necessary steps to be in a position to restart its business and to protect its current assets.  Ultimately, the Debtor intends to file a plan of reorganization that provides creditors with their best chance of a recovery on their claims.  As part of that process, the Debtor intends to market its assets for sale. However, while the Lender is willing to fund a sale process and various expenses required to maximize the value of the Debtor's assets, the Lender is not willing to provide additional funding outside of chapter 11, or on terms other than those set forth in this Motion and the Credit Documents, and no other sources of liquidity are available to the Debtor.  Accordingly, the Debtor commenced this chapter 11 case on the Petition Date in order to obtain the financing necessary to restart its business operations, to implement an orderly sale process, and to ultimately confirm a plan of reorganization.  To achieve those goals, the Debtor has requested authority to enter into a secured debtor-in-possession financing facility (the "DIP Facility") with the Lender that would be established pursuant to the terms and conditions of: (i) the proposed interim order for the DIP Motion attached to the DIP Motion as Exhibit C (the "Interim Order"); (ii) the Existing Credit Agreement, as ratified and amended by the Debtor in Possession Financing Amendment and First Amendment to Loan Agreement, attached to the DIP Motion as

___

Exhibit B (the "Amendment"); and (iii) the other Existing Credit Documents (as defined in the DIP Motion), as ratified and amended by the Amendment.[5]

35. The proceeds of the DIP Facility will be used to fund certain necessary expenditures permitted under the Interim Order, the Credit Documents, and the budget to be presented at or before the hearing on the DIP Motion (the "Budget"). Those expenses include complying with all applicable government regulations and preparing the Debtor to restart its business operations and to begin marketing its assets. Upon entry of an order granting the relief requested in this Motion on a final basis (a "Final Order"), the Debtor will continue to use additional funds under the DIP Facility to meet these obligations to comply with applicable government regulations and to take all necessary steps to maximize creditor recoveries.

36. Given the dormant state of the Debtor's business operations, however, the Debtor does not anticipate generating any significant amount of cash collateral within the meaning of Section 363(a) prior to late August or early September 2014. However, the Lender has agreed to allow the Debtor the use of any Cash Collateral it generates on the terms set forth in the DIP Motion.

37. Prior to the Petition Date, the Debtor endeavored to identify potential sources of postpetition financing. However, substantially all of the Debtor's assets are subject to the liens asserted by the Lender and, because of the substantial amount of the Prepetition Obligations and the shutdown of the Debtor's business operations in December 2013, the Debtor was unable to obtain the necessary financing as unsecured debt under Section 503(b)(1), as an administrative expense under Section 364(a) or (b), or as debt secured by liens junior to the liens of the Lender. The Debtor has not been able to obtain postpetition financing or other financial accommodations

---

[5] The Existing Credit Agreement as ratified and amended by the Amendment is referred to herein as the "Credit Agreement". The Interim Order, the Credit Agreement, and the other Existing Credit Documents (as ratified and amended by the Amendment) are referred to herein, collectively, as the "Credit Documents".

---

from any alternative prospective lender or group of lenders on more favorable terms or conditions than those set for thin this Motion.

38. Without postpetition financing, the Debtor will be unable to fulfill its obligation to comply with applicable government safety and security regulations or to take the steps necessary to protect and preserve its assets such as purchasing and maintaining insurance coverage for the Debtor's assets. The Debtor's failure to secure postpetition financing would put the Debtor's assets at risk, impair the value of the Debtor's estate, and significantly impair any creditor recoveries. Conversely, by obtaining the financing proposed herein, the Debtor will be in a position to preserve, if not increase, the value of its assets for the benefit of all creditors.

39. The terms of the proposed DIP Facility were negotiated in good faith and are fair, reasonable, and adequate under the circumstances. The Debtor and its proposed bankruptcy counsel carefully evaluated the proposed financing offered by the Lender, and engaged in extensive arms' length negotiations with the Lender and its professionals regarding the proposed terms and conditions of the DIP Facility. Eventually, the Debtor, in its sound business judgment, agreed to the DIP Facility as the proposal best suited to the Debtor's needs.

40. The Debtor requests that the Court authorize the Debtor, on an interim basis pending the Final Hearing, to borrow under the DIP Facility in an aggregate amount up to $500,000. This relief will enable the Debtor to operate its business in a manner that will permit it to preserve and maximize value, and avoid immediate and irreparable harm and prejudice to its estate and all parties in interest, pending the Final Hearing. Absent the Court's entry of the Interim Order, the Debtor could not comply with applicable government safety and security regulations. Without the current efforts to preserve the Debtor's assets and restart its business operations, creditors, including former employees with unpaid wage claims, would receive little

or nothing from the Debtor's bankruptcy estate. As a result of approving the financing, the Debtor will be able to revive a dormant business and potentially be in a position to pay its unsecured creditors a substantial recovery under a plan of reorganization. In addition, reviving the Debtor as a viable going concern will benefit not only Hardin County (where the Debtor is located) but the entire region

41. I declare under penalty of perjury that the foregoing is true and correct.


Dated: May 5, 2014              */s/ John Stuecheli*
                                John Stuecheli
                                President & Chief Restructuring Officer